Call the last case, which is Bingham v. HCA. Good morning, Your Honors. May it please the Court, I am Jeremy Friedman, and I am the attorney representing the Relator Thomas Bingham. With me at counsel's table is Jonathan Croner, one of the attorneys at Trial Counsel. Thank you for the opportunity to appear today. I want to start with the Centerpoint claims, but I want to make sure I have some time to address the Aventura issues. And I thought maybe in dealing with the Centerpoint claims, I'd go over the facts of the unbroken chain of remuneration that flew from the hospital through Tegra, the intermediary, to the doctors that were in the medical office building. It started with a 99-year lease at a price of $1.78 million, when the fair market value for that lease, including the parking easement, was $4.38 million. That was in Exhibit 1, Plaintiff's Exhibit 1, the Scaletti Declaration. While they were leasing, the second thing is that HCA agreed to lease up to 70% of the unused space, and they weren't going to use it. They were just going to rent it. And these are called burn-off leases, because as tenants moved into the medical office building, HCA's obligation would burn off. This ensured a positive cash flow into the intermediary, and it exposed HCA to up to $8.37 million in additional costs that they would have to pay. It turns out they paid up to $1.4 million. This is all in Exhibit 162-5. Aren't we focused here on what the doctors received and whether that was market value or not market value, or exceeded market value? Isn't that the essence of this case? It's not the essence of the case, Judge. But isn't the problem here giving a benefit to doctors that leads them to make recommendations to the hospital, and therefore if the doctors are just getting what they would normally get without fair market value and they were just simply getting with fair market value and they were simply getting what they paid for, that there wouldn't be a problem. If there was, the issue of fair market value doesn't come into it unless there is an exception. So for example, there is an exception for leases because many hospitals will rent spaces to doctors, and that's a remuneration. All we have to show in the prima facie case is remuneration. Fair market value does not enter into that. And if they're paying... All you have to do is show that the doctor has got something without saying what its value is. Well, that's not completely true. So you do have to talk about the value of it. And they got rents at the low bottom of the market rates. And that's a factor. It doesn't have to be below fair market value for it to be remuneration. But the most important point here is that there's an investment interest. The doctors were given an investment interest by agreeing to move into the medical office building for at least 10 years. When you have an investment interest between the doctors and the intermediary, you don't look to the link to what they got in the... What they got paid by in terms of rents. You look to what was funded to Tegra. So in other words, if you look at the actual regulation... But counsel, going to Judge Walker's question, the HCA had an economist who said that even with the cash flow participation agreement, it was fair market value, it being the rent. They did have an economist that said that Dr. Heckman did not include that in the excerpts on appeal. If you look at Mr. Heckman's testimony, it is in fact disputed. He is an economist. He's not an appraiser. They didn't redo an appraisal. The way he readjusted the figures... Is it required to prove the non-fair market value as a part of a prima facie case? And if the answer is no, tell me why not. We would prove non-fair market... You have to show that. We would have to show non-market value. We don't have to show it. Non-market value is a defense. And as long as there's remuneration... In fact, you can have an AKS violation. It will help me if you, whenever you make a statement, if you say whether or not you're referring to the stark claims or the anti-kickback claims. My question was focused on the anti-kickback statute. For anti-kickback statutes, the statutes in case law and the regulations themselves are clear that fair market value is not the issue. Unless there's a... You say it's not the issue. It's not required. It's not required to show remuneration. Make a prima facie case, your view is you do not have to establish that there was no fair market value. Put in the affirmative, you can establish a prima facie case even if it was at fair market value. Yes. That's your position. Yes. What you need to show is remuneration. If somebody hires me and pays me a fair market value for my fees, that's remuneration. Then the question becomes under... The language itself is very broad, Ms. CFR. Remuneration means any payment or other benefit made directly or indirectly, overtly or covertly in cash or kind. That's correct, Your Honor. And so it is very broad. And the reason why is because any time there's a payment, you don't want to argue over whether it's fair market value, there's a payment. Then the question is if there's a payment, if there's remuneration going on, you have to fit within a safe harbor or you have to fit within a Stark exception. An AKS... I'm not talking about Stark now. I'm only talking about the Kickback Statute. Let's focus on the Kickback Statute. Okay. Under the Kickback Statute, it's a safe harbor. And in order to... Which means what? Means that if you are going to want to rent an apartment from a hospital, which happens all the time, you have to meet the AKS safe harbor for office rentals, for space rentals. And those require numerous things. And I would say on this appeal, HCA has even waived that. I read through their briefs. There is no argument that they meet the AKS safe harbor for office rentals. So the only real question is, is there an unbroken chain between the hospital and the doctors of remuneration? You get a prima facie case, but then when you get to the safe harbor, at that point, you haven't talked about what the standard is about the safe harbor, but it seems to me that there has to be an answer to it is it was fair market value. If there is, if you get to the safe harbor provision, then there would be an argument over it. But in this case, there was no claim that there was a safe harbor provision. Well, help me understand just that. As I understand the CFR here, under the safe harbor provision, I'm still talking about the AKS now. Remuneration under the AKS quote, I'm reading from the CFR, does not include any payment made by a lessee to a lessor for the use of premises so long as certain standards are met, including that the aggregate rental charge is set in advance, that's one, is consistent with fair market value in an arms length transaction, that's two, and three, is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part. Help me with respect to that. Is there evidence suggesting this was fair market value? And was there any evidence that went to whether or not the manner in which it was determined was related to the volume of or the value of any referrals? I'm sorry, Your Honor, I think you're reading the Stark regulation. And you think I'm not in the... The Stark regulation... I thought that's under AKS, 2042 CFR, section 1001.952B, isn't that AKS? Yes, 1001.952B. That's what I just read from. And that is the safe harbor exception for... For the AKS. For the AKS. I'm simply asking whether there was record evidence adduced here dealing with A, fair whether it did or did not take into account the volume of any referrals. There is evidence of that. There is plenty of evidence because it was an investment interest between the physicians and Tegra. You don't look to the fair market value of the rents. You look at the fair market value of the transactions between HCA and the intermediary. And when you look at that, there was plenty of excess market value. Plus there were direct payments. There was improvements to the premises that were given directly to these tenants. There was maintenance. There was paving. There were free parking. Is there any evidence that this was determined in a manner that took into account volume or value of any referrals or business otherwise generated? Yes, your honor. There's direct evidence that HCA considered the volume of business when... generated by those doctors when they decided to fund and subsidize the intermediary. When they wanted to build the medical office building. There were statistics that indicated that there was no change or direct effect on that score. Surely, the whole purpose of doing this is have the doctors be next door. That's not the test. The test isn't you can't have doctors next door. The test is are they getting fair market value or are they getting a break? Is this a sweetheart deal in some way? And it is. You're exactly right, your honor. It is a question of whether there's a sweetheart deal. So the fact that the hospital wants to have doctors next door and thinks that because of the convenience of the doctor being there and the hospital being there that they might get referrals, that's just normal business practice. That is, but they cannot overfund the intermediary so that money flows to the doctors to attract them to come in and become doctors, referring doctors in the medical office building for 10 years. So the money that flows has to be money that would not be... not be flowing in a normal business situation. That's right. And in this case, I was... I started out pointing out all the excess money that they were putting into the intermediary and then that all passed through in tens of thousands of dollars per year to the medical groups and hundreds of thousands of dollars when the building got sold. This investment interest that was given to the doctors so long as they agreed to become referring doctors in the medical office building next door, that paid off big. And that's the major part of the case. But the payoff wasn't based on referrals. The payoff was based on the square footage they were running. And so I don't see the causal connection. Well, the square footage that they're renting and the length of time that they're there. And so if they're renting larger offices, they're going to have more doctors. And the longer they're there, they're going to have more referrals. So there is a relationship. It's the more referrals part that is missing in what you just said. The longer the doctors in the medical office building, the more money they get and the more referrals they make. So there is a direct connection. But actually, because- I couldn't find that and more referrals that the doctors were paid on the participation agreement in accordance with their referrals. I thought it was just square footage in the size of- It is square footage, Your Honor. It is square footage. And the other stuff about the rent, I mean, wasn't there testimony by both the economist and the appraiser that that's ordinary, that there are build-out costs that the tenants would be given and that all of those costs fell within the fair market value? It wasn't ordinary. We have- There's a dispute of fact over that. In fact- Tell me where that comes from. Well, in Bingham's declaration, paragraph 58, I think. Bingham's original appraisal said, this is fair market value. That did not include the cash flow payments. Right. So there were hundreds of thousands of dollars that were not included. There was no appraisal after that original appraisal by Bingham. I read what Bingham then did. He just said, I don't think the HCA economists got it right because they said this and that, and this is wrong, that is wrong. But there's no appraisal. It's just like cross-examination. There's an appraisal of the land deal, but there's no appraisal of the fair market value for the rents considering all those things. You're right, Your Honor. But we don't need that because the fair market value only comes into the play is if you're talking about one of the exceptions or safe harbors if we're talking about AKS. And in this case, there is no attempt to try to claim that this is a rental space. They needed to be signed at the time. The amount had to be set in advance. They had to be signed by both parties. None of those things apply here. That's why there is no claim by my brothers here that there is a safe harbor. It's not in the briefs. It wasn't down below. And they've waived it. So the only thing we really need to do is to prove an unbroken chain of payments. And the subjective intent of HCA in doing those excessive subsidies is to build a medical office building and attract doctors there away from St. Mary's who is already developing a medical center that was the kind that would have attracted doctors. They're trying to attract doctors by paying them money rather than building a good hospital. Yes, you can build an office building. And although because of the corporate integrity agreement, HCA had a hard time doing that. But they could have done it. They needed a truly independent third party. They needed to have all of these things audited, not by manipulated audits that didn't account for the actual payments. Mr. Friedman, you're already eating into your rebuttal. You're free to do that. But you wanted to reserve three minutes. I would like to. But I do want to address a venture. Should I save it for the rebuttal? Up to you. I'll save it for the rebuttal. All right. Thank you. Thank you. May it please the court. My name is Scott Ballinger with Mayor Martin Goldberg and Greg Weintraub for the defendant HCA. If I may, I'd like to start by trying to straighten out this burden of proof question. Because I think that's where all of this needs to start. Relator's argument that all that he has to allege or prove is some kind of financial relationship. And then it somehow shifts the burden to the defendant to prove that there was any non-fair market value exchange is just wrong under the statute and the case law. Let me start with the anti-kickback statute. Because Judge Marcus, you quoted the stark definition of remuneration. The anti-kickback statute definition of remuneration is different. Read it to me. In a really important way. It's remuneration is defined in the anti-kickback statute as a transfer of items or services for free or for other than fair market value. That's 42 U.S.C. 1320A-7A I-6. So it is relator's burden to plead and to prove facts establishing a transfer of items or services for free or for other than fair market value. The relator's brief is built around citing cases that say that a transfer of anything of value can be the predicate for an anti-kickback claim. Of course, that's right. But it has to be a transfer of anything of value for free or for less than fair market value. All of the cases recognize, including the cases that relator cites, that there has to be some non-fair market value exchange under the anti-kickback statute as a matter of the relator's prima facie case. Now, under stark, the stark definition of remuneration is broader. But that's because the focus of the stark law is on compensation that varies with or takes into account the volume or value of referrals. Now, because there's no direct relationship between HCA and these doctors, it's a two chain, right? The stark regulations require proof of an indirect financial relationship. That's 42 CFR 411.354 C2. And an indirect financial relationship has three elements. It requires an unbroken chain of financial connections. That's true here. But it also requires then compensation at the link closest to the physicians that varies with or takes into account the volume or value of referrals. And then it requires actual knowledge by the hospital of that improper arrangement. That's their burden to establish that an indirect financial relationship exists at all here at the outset. And Judge Cook's, oh, and by the way, they're trying to change the subject on appeal to the definition of an investment interest rather than the indirect financial relationship definition. That's waived. They never made that argument below that the CFPAs are an investment interest. But it makes their case worse, not better. Because if you treated the CFPAs as an investment interest, the regulation would tell you, you then have to look at the non-ownership or non-investment interest closest to the physicians. So you would shift from looking at the relationship between Tegra and the physicians to looking at the relationship between HCA and Tegra. And you would ask, does the relationship between HCA and Tegra vary with or take into account the volume or value of referrals? And the answer is an undisputed no on this record. There's not even an allegation that the relationship between HCA and Tegra took into account the volume or value of referrals. So the really critical point is to keep separate the two different regimes. So to the extent he suggests there was evidence, that's wrong. That's incorrect. It takes into account, quote, the volume or value of any referral or business otherwise generated between the parties for which payment may be made in whole or part under Medicare, Medicaid, or other federal health care program. Judge Cook correctly recognized there's no such evidence on this record. And so the basis of the district court's decision was that there was no proof adduced by relator that any doctor got a better than fair market economic deal, which is the anti-kickback issue. And there's no evidence in the record that any doctor got a deal that varied with or took into account the volume or value of referrals. What about the investment in the cash flow participation agreements and the fair market value? What proof was there on that score? Well, your honor, the relator adduced absolutely no proof about fair market value on the cash flow participation agreements. But four points on that, because it's actually the only dispute in the record. Relator repeatedly conceded that the base rent was fair market value. So you're right to focus on the cash flow participation agreements. So four things. First, it's undisputed that the cash flow participation agreements were an exchange for the tenants agreeing to a 10-year lease, which is a huge financial commitment to the building. There is no evidence in the record from relator that a cash flow participation agreement at these percentages is not a fair exchange for signing a 10-year lease. Second, the only evidence that is in the record on that issue is actually the 2007 standard business and lease terms memo from Holiday Properties to HCA, which relator himself prepared. Relator was the appraiser at Holiday Properties who did the market rent study underlying that 2007 memo from Holiday to HCA. And if you look at it, it is in volume one of our supplemental appendix. If you look at it, you will see that it on its face acknowledges that this building is offering cash flow participation agreements. You will also see that two out of the four comparable buildings that relator himself used as comps to determine the fair market rent also had cash flow participation agreements. And you will notice that relator does not say in that document that the fair market rental range varies or changes in any way or depends in any way based on whether a particular tenant has a cash flow participation agreement or not. It treats the cash existence or non-existence of a cash flow participation agreement as a question totally separate from fair market rent. And, of course, that's because it's the quid pro quo for signing a 10-year lease, which is an entirely separate exchange. Third, that document, you will see, does not anywhere say, relator never said, nobody at Holiday ever said, that HCA could not rely on the 2005 market rent study that relator spends so much ink attacking in this appeal. When he was at Holiday and he prepared the 2007 study, he never told HCA or anybody that there was anything wrong with that 2005 study or that it couldn't be relied on. This is a False Claims Act case. It was about knowing submission of a false claim to the government. So how was HCA supposed to know? Fourth, the only evidence in the record shows that even if you did wrongly to treat those cash flow participation agreement payments as if they were a pure windfall and deduct them one for one, dollar for dollar, from the rent that was paid, the only analysis and evidence that is in this record is Dr. Heckman's affidavit, which is in volume three of the appendix, that concludes that even if you deducted dollar for dollar, still no doctor would have paid less than fair market rental range for the net rent that they paid. The net effect of these cash flow participation payments for the five non-HCA physician groups that got them was to reduce the overall net rent by, I think, about $2 a square foot. It was less than 15% of reduction in the total rent. And it was a consequence of committing to a 10-year lease and then the lucky fact that the building appreciated between when these leases were signed and when the building was sold in 2012. Now, the total absence of evidence that anyone got a non-fair market deal or a deal that varied with referrals is dispositive and sufficient to affirm here, but there are plenty of other fatal defects in the relator's case that would have required summary judgment anyway. One of them is the exception for indirect compensation agreements under Stark, which is 42 CFR 411.357P, I think. HCA argued that below and relator didn't even contest it. The requirements are clearly satisfied. It is true that we have not argued for alternative affirmance under the Stark leasing. I mean, I'm sorry, the anti-kickback statute leasing exception that Your Honors discussed with my brother earlier in the argument. But the requirements of that are clearly satisfied. These are leases that were set out in writing and specify everything. The only real argument that they have made to the contrary is that the terms weren't quote-unquote set in advance because the cash flow participation agreements could swing up and down. But I think if you look at the regulations, 42 CFR 411.354D1, you will see that set in advance just means that the formula has to be set in advance, not that the amount has to be calculable in advance. Help me understand the anti-kickback statute. I think I may still be confused about it. Under that statute, even if there is a legitimate purpose for the arrangement and a fair market value payment, would that legitimize a payment if there is also an illegal purpose? That is to say, inducing the federal health care program business or something like that? Well, it's a criminal statute and it requires proof that the defendant knowingly and willfully paid . . . Supplemental compliance program guidance for hospitals and it appears to say under the anti-kickback statute, neither the legitimate business purpose for the arrangement nor a fair market value payment will legitimize a payment if there is also an illegal purpose. That is to say, inducing the federal health care program business. I think . . . Is that a fair statement of the law? It might not be. No, I don't think it is. That's their position. I think that's their position. Do you understand? I mean, that's cited in the Office of Inspector General's compliance guidance. I think . . . It doesn't get to tell us what the statute means, but that's what he thinks it means. And I think that it's an out-of-context quotation from the OIG guidance. I think if you read the whole guidance, you would not get that impression. Relator is relying on . . . The language I've just read you says something quite different. That one sentence does, Your Honor. Yes, indeed. It's a clear and unambiguous statement that a claim still could lie if there is an illegal purpose as well. It's kind of a mixed motive kind of an issue. And I think the confusion, Your Honor, is if you look at these mixed motive cases that Relator is citing, the vast majority of them are actually mixed payment cases where the doctor is being . . . But some are mixed motive too, aren't they? I believe so. But the vast majority are mixed payment cases. And I think that's what the Inspector General was talking about there, where the doctor is being actually paid for a real service that has a value, a fair market value. But then there is some additional increment of non-fair market compensation that violates the anti-kickback statutes remuneration definition and the rule that you can't pay non-fair market compensation with the purpose to induce referrals to a federal health care program. Remember, it's not illegal, as Judge Walker pointed out, to have a purpose, to have a successful hospital, to get referrals, to recruit doctors to your hospital. The purpose that's forbidden, even in part, is a purpose to get referrals by paying improper remuneration for . . . Ambulance case? Are you familiar with that case? I don't remember. United States v. Bay State, 874 F2D 20, 1989, where the Third Circuit rejected or appeared to reject the argument that reasonable payment for actual work done, which looks a lot like fair market value, necessarily vitiates the possible anti-kickback statute violation. Well, Your Honor, I believe there's been a lot of water under the bridge since . . . Maybe so, but it suggests that a violation could be sustained, even if there were fair market value. I believe that's inconsistent with the plain language of the statute and all of the cases . . . That may be. At pages 32 to 35. You may be right about the statute being clear on it, but it's . . . Okay. Well, I think that that case law is outdated, Your Honor, but regardless . . . Outdated why? The statute's the same statute. It's just the construction they put on it. I believe that all of the recent case law that we cited at pages 32 to 33 of our brief recognize . . . It's outdated in the sense that there is better case law that's more persuasive, not that the statute has changed. I believe that's . . . That's what you're saying. I believe that's correct, Your Honor. But regardless, the statute also has a scienter requirement, Your Honor. Okay, so even if you set aside our dialogue about the meaning of the word remuneration under the anti-kickback statute, the statute also requires a purpose to induce referrals, which this court has held knowingly and willfully requires not just a purpose to induce referrals by paying unlawful remuneration for them, but also that knowingly and willfully means knowledge of illegality, at least in a general sense. A bad purpose to disobey or disregard the law. That's the Starks case at 157 F. 3rd 833 from this court. And I submit to you there is not an iota . . . Purpose. It's enough that there is a bad purpose. As if you can otherwise establish they acted with the intent to do something the law forbids, even if they had a good purpose at the same time, that doesn't necessarily preclude stating a claim. That's correct, Your Honor, but you have to be very precise about what the bad purpose is because Relator's entire strategy in this case is to obfuscate around the fact that HCA . . . one reason for building this medical office building in the first place was that HCA wanted to get more utilization of its hospital, more referrals to the hospital. There's nothing wrong with that. The one purpose that is forbidden, even if it's only a partial motive, is a purpose to get referrals by paying improper remuneration for them. And all of the case law that Relator cites, like the McClatchy case from the Tenth Circuit is really good on this. The jury instructions that are given in these cases say that there's nothing wrong with . . . All I'm suggesting to you is that when we're looking at the issue of intent to induce a referral in a mixed motive, if there's a good motive and a bad motive, and you can establish the bad motive by a preponderance, that's enough to state a claim, even if there otherwise was a good or a sound business reason. We have no quarrel with the mixed motive cases as long as you're precise about what the forbidden motive is. It's not a mere motive to increase utilization, to recruit doctors to your hospital, to build an attractive and convenient campus where doctors want to practice medicine. All of those things are perfectly fine. The motive that is forbidden is an intent to get referrals by paying improper remuneration for them. The impression I get, and maybe I should be asking your adversary this, is that HTA, when they embarked upon this project, employed counsel with the Andy Kickback statute and the Stark statute fully in mind, and structured the deal with that in mind to avoid problems that could be otherwise generated if they hadn't used an intermediary, for instance, and matters of that sort. Am I incorrect on that? You're absolutely correct, Your Honor, and that is one of several reasons why I think there is no way that there is a triable issue on a consciousness of wrongdoing.  We didn't plead advice of counsel as an affirmative defense, Your Honor, but you don't have to plead advice of counsel as an affirmative defense. In the course of the summary judgment argument, did you allude to reliance in good faith on advice of counsel as a means of blunting any claim that there was an unlawful inducement with a bad purpose? Yes, among many other arguments for why Relator has not established— No, I understand you made other arguments. I'm just asking whether that was part of the pleading and part of the proof that you were putting forth in this case. Yes, Your Honor. We pointed out that one reason why there's no evidence of consciousness of wrongdoing on this record is that counsel was involved at every stage. There are lots of other reasons, too. HCA got independent third-party valuation opinions. HCA insisted that all of the transaction documents require Tegra to use fair market value terms and terms that didn't vary with the volume or value of referrals. There's no triable case on Scienter here. And the district court also recognized that to turn this into a false claims act case, you have to actually show that some doctor's referral judgment was corrupted and that a claim for payment was submitted that would not otherwise have been submitted because of that payment of remuneration. That's 42 U.S.C. 1320A-7BG and the Osharoff versus Tennant case, and that wasn't satisfied either. I didn't have a chance to address the 9B issues in Aventura. If the court would like me to, I would be happy. Oh, I think the time is up, but thanks much. Mr. Friedman, let me ask you a question right at the outset. I want you to help me with the record. And tell me specifically, what evidence is there in this record that addressed taking into account the volume or value of any referrals or the business otherwise generated between the parties? Where will I find that? You will find that, first, you have to decide which link you're looking at. And because of the investment link between the hospital and the, between the intermediary and the doctors, you have to look at the link between the hospital and the intermediary. Did they take into account, did they consider the volume of business that was going to be generated by this medical office building? And clearly they did. That's all throughout the planning stages. And that was in Mr. Jensen's deposition, Exhibit 19, he goes around with the cash flow participation agreements, and he goes to the different offices and he explains how much money they're going to get. I think one of the most important points here... How much money they're going to get, but where's the quid pro quo? We expect referrals to be not X, but Y as a result of the cash flow. And that had better happen. Was there any evidence like that in this case at all? There is in the most essential way that you don't even see it. It's to get a doctor... Is it sort of generally understood? No, it's to get a doctor to move into a medical office building on campus. Do you know that that's normal business practice? Do you know that that's normal business practice? It is. Your adversary said it. There's no problem with that. Oh, I'm sorry, Judge, I misunderstood. You mean the cash flow is normal practice? That's not normal practice. Getting a medical office building on campus so that doctors come in and refer, that's normal. That is why both Stark and AKS require that you either meet the safe harbor or the exceptions, because it's going to happen all the time. So they have to make sure that when you fund money to an intermediary and the doctors have an investment interest in that, that you have to make sure everything is at fair market value. And there's not even a dispute that there's way over fair market value in the lease terms, in the burnout leases, in the maintenance that they did, the paving that they did, the parking that they did. All of this came to the doctors for free because all of it was given to Tegra for free. And in document 162-5, you see it has nothing to do with the lawyers trying to figure out how to make this legal. In the second page, Boyer is the name of Tegra, so it refers to Boyer. It says, we could not do it. Empty participation was a major reason we invited Boyer to this location. Far too much has been published locally to the medical community regarding this to make 180 degrees turn without a lot of turmoil. In other words, they offered all of these deals, these sweetheart deals to these doctors to move into the medical office building and to continue referring business. And in order for them to change their mind once their lawyer said, wait a second, we're not allowed to let physicians be investors. We're not allowed to kick over all these extra costs. Then they said, well, there's nothing we can do about it. We've created too much turmoil. To go to Judge Marcus, the point that you were making about... I was asking where in the record I can find evidence of the kind you more generally alluded to in your opening remarks. Oh, in my opening remarks, I had... I want to know where there is evidence in this record that address taking into account the volume or value. Okay, that would be... Any referrals or business otherwise generated between the parties. You gave me a partial answer and you responded to a question Judge Walker had. Is there anything else in this record that you presented on that issue? And if so, where can I find it? It was in my notes. Sorry, Your Honor. It's all right. Take your time. It was in Exhibit 2 of the defendants when they said... It was their planning documents where they said that they were going to build a medical office building. They were going to put those costs for the building, medical office building, off balance sheets so that it wouldn't be covered by the corporate integrity agreement. And then they projected how much money was going to be generated, how much business was going to be generated by those doctors in the medical office building. So that's clear that they had in mind when they decided to build the office... How is that inconsistent with normal business planning of the kind that you and your adversary and all of us seem to say is acceptable? Naturally, they're going to be looking at how the deal will play out, but that doesn't necessarily show a quid pro quo. Can you build a medical office building on campus to attract doctors that you can make more money? Yes, you can. And you can think about it. And you can think about it. Maybe even project how that might work. But if you put extra money into the building in order to make that happen, you're using the money that you're putting into the building above your market value. What you're suggesting, it seems to me, Mr. Friedman, is that they would have been... They couldn't even look at the projected revenue they would get. It's insane. What business would put up a building without calculating cost and gain? They would. They have to audit it. Is this anything different than that? And if it is, tell me how. The big difference here... You said that Exhibit 2, the planning document, shows that they were looking to increase hospital utilization. There's no real dispute about that. They built an office building in the hope that it would generate more revenue. The big difference here is... They made some calculus as a general matter of that. Does that run afoul of the anti-kickback statute? It does if the physicians have an investment interest in the building. There's no question about it. That's why the lawyers said don't allow... I'm talking about the hospital. Yes, if the hospital is going to build the building, it has to make sure that there's no investor physicians. It also has to make sure that the amount that's being paid is fair market value for rent. They also have to charge them for use restriction waivers. They have to charge them for the maintenance. They have to charge them for the upgrading in the parking lot. All of those things are normal business things. You can't just give freebies to the doctors. And so, yes, you can build it. As their own lawyers said, you have to do your due diligence. Make sure there's no physician investors. There were physician investors and they couldn't change it because they had already told the medical community that they were going to have that and it would cause too much disruption if they took that away. Nobody's saying that a hospital can't build a good medical building. Although HCA has a little problem because of their repeat player and they have a history of doing this incorrectly. And so they had to disclose all of these things to the government and audit them and they did not. What about your other point about Aventura? On Aventura, we asked that the court follow the... Well, what Judge Cook did is created a conflict with other decisions saying that relators are not allowed to amend their complaints. To revise a complaint based upon after the complaint has passed through preliminary motions on the pleadings to allow for what evidence further disclosed. It's another thing to not have that and have a basis upon which the complaint is going to be considered and then further evidence is permitted just as a matter of administration. To allow the... And then using that to kind of repair a deficient complaint that is deficient in the first place. Well, in this case, there was a claim that was not deficient. And so the question is, if you're... Your case rests upon the first complaint. That's not the only reason. But in this case, when there is a claim going forward and you find out additional evidence of a different additional claim, you should be able to amend the complaint. Plus, in this case, there's... Let's say, many times, as the court knows, being district court judges in the past, that sometimes these Rule 9b motions are brought later after discovery is done. Does that mean that a relator can't amend the complaint to add additional facts? Let's say they find out one of their facts is false. That's wrong. We got it wrong. They can't amend their complaint to conform to proof? This whole question goes away as soon as we adhere to the true 9b standards. In this case, in the 9b standards... So you basically say, going forward, any party, any defendant would be crazy not to object mightily to further discovery, lest other things be developed. That could result in a modification of the complaint. Well, they do. They object, but it's okay. They're entitled to have the discovery limited to what's in the complaint. If, during the litigation, you find additional information, you're allowed to amend the complaint. In fact, you're obligated to amend the complaint. And there's nothing wrong with that. What happened here with Judge... And it's a question of, really, whether the judge abused his discretion in excluding the evidence, excluding the second complaint as a result of this. It's not an abuse of discretion, Your Honor. Did they follow the law in looking at the ruling on 12b-6 on the operative complaint? This judge did not look at the operative complaint. She said, we have to look back to the prior complaint that you made. And it's particularly unfair here because in the initial complaint, Mr. Bingham had plenty of information. He already knew about the scheme that was at headquarters. And he also knew a lot of information about Aventura. In fact, that was the original claim that he brought was based on Aventura. I'm going to ask you to bring your remarks to a conclusion. You're almost eight minutes over. What it lacked was a narrative. In other words, saying you can amend the complaint, give me a narrative. Then when you give them the narrative, you say, oh, sorry, it's too late. You should have given me the beginning. That brings us back to pre-1937 rules of civil procedure. Thank you very much, Your Honors. I'm going to give you a moment or two. Your colleague, thanks very much to address this one issue. Since we really asked him only to address it at the back end without giving you a chance to respond. I appreciate it. Why don't you take two minutes and respond to it? OK. Thank you, Your Honor. We pointed the court to the Keillor versus Esai case in which this court affirmed a decision that was just exactly like this one. The relator in that case asked to file a fourth amended complaint based on newly discovered evidence of fraud, supposedly that he obtained in discovery. The district court held that letting him, quote, use documents obtained in discovery to overcome pleading hurdles would circumvent the purpose of Rule 9b. This court affirmed for the reasons set forth in the district court's scholarly and thorough order. That's 568F Appendix 783 from this court in 2014. And I'd just like to stress two points substantively. The first is that 9b plays a really important role in pleading law generally, but in Keatam cases in particular, as this court and many others have recognized. There's big potential windfalls for relators in these cases, and therefore a very strong incentive to file a case even if you have no actual evidence of wrongdoing and hope something just turns up. And as Judge Cook pointed out below, the United States has to make its intervention decision on the basis of the complaint that's filed within 60 days. And so letting the relator resurrect a case that was insufficient when pleaded really messes with the way the statute is supposed to work around the government's option. And the second important point is, I think the one that Judge Walker was alluding to, which is that the rule relator is seeking here won't actually help relators going forward or have any practical effect other than to curtail the district court's case management discretion. Because you're right, Judge Walker, no defendant will allow discovery to go forward while there is a 9B issue pending if the court accepts relator's argument. Judge Cook in this case wanted to fast track discovery for the very good reason that it would lead to a rapid resolution of the center point claims on summary judgment. She was right. This was a triumph of the way rule one of the federal rules of civil procedure are supposed to work. Thank you much. Thank you all. This court will be adjourned.